Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 5077 | DATE | JUL 27 2000 |
| CASE TITLE | Smith v. Bravo | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the defendants' Motion to Disqualify Plaintiff's Counsel and Stay Civil Proceedings Pending Outcome of Related Criminal Matter [#33-1, 33-2] is DENIED. Ruling date of July 31, 2000 on this motion is stricken.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| X | Notified counsel by telephone. | | JUL 28 2000 date docketed | |
| X | Docketing to mail notices. | | | 41 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | dc(lc) courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TAMIKA SMITH, | ) |
| Plaintiff, | ) |
| | ) No. 99 C 5077 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| OFFICER J. BRAVO, STAR # 4123, | ) |
| OFFICER M. SNOW, STAR #9366, | ) |
| CHICAGO POLICE OFFICERS, | ) |
| UNKNOWN CHICAGO POLICE, and | ) |
| THE CITY OF CHICAGO, | ) |
| Defendants. | ) |

DOCKETED
JUL 28 2000

## MEMORANDUM OPINION AND ORDER

Tamika Smith brings this civil rights action for money damages under 42 U.S.C. § 1983 ("§ 1983"). She claims that Officer Jaime Bravo shot her without justification, thereby violating her Fourth Amendment Rights. Officer Bravo, unknown Chicago police officers, and the City of Chicago (collectively, "defendants")[1] seek to disqualify Smith's counsel and stay these proceedings pending the resolution of a state criminal case which defendants claim is related to the instant civil action. For the reasons discussed herein, the defendant's Motion to Disqualify Plaintiff's Counsel and Stay Civil Proceedings Pending Outcome of Related Criminal Matter is denied.

---

[1] Officer Michael Snow was dismissed from this action.

-1-

## I. Factual Background

There is a ritual in Chicago, whereby some residents ring in the New Year (or ring out the old) by offering a military style salute with their personal firearms. December 31, 1997 was no exception. As midnight approached, gunfire rang out all over the city. Chicago police officers J. Bravo and M. Snow happened to be on patrol in the 8500 block of South Saginaw as 1997 became 1998. They observed Theodore Jarvis firing into the air and they promptly arrested him. As Snow placed Jarvis into a squad car, Bravo walked down a gangway at 8331 South Saginaw.

From here, the stories told by the plaintiff and Bravo diverge. All agree that Smith was standing in the back yard of the home at 8331 South Saginaw and that Bravo fired at least one shot that struck her in the leg. It is that action by Bravo that gives rise to this action. How the shot(s) came to be fired is a matter of great dispute between the parties. According to Smith, she was standing in the yard alone looking at and listening to the celebrations when Bravo shot her for no valid reason. According to Bravo, Smith was in the backyard with Shaunte Dotson ("Dotson") who was firing into the air when Bravo announced his office and told Dotson to drop the gun. Bravo says that instead of complying, Dotson turned toward Bravo and fired a shot. Bravo then returned the fire, missing Dotson and striking Smith. Such conflicting tales are the stuff of lawsuits and in the normal case, the jury would determine the true state of affairs on the final wintry night of 1997. Alas, this is not a typical case.

Dotson, who is the father of Smith's two young children, was tried and convicted in state court of aggravated discharge of a firearm at a police officer. The original conviction was overturned because of the state's failure to turn over certain exculpatory information. On retrial, Dotson was convicted, albeit of the lesser charge of firing a weapon in the direction of a person

other than a police officer. Dotson's attorney during the state proceedings was David Gleicher. Approximately one year after Dotson's sentencing on the second conviction. Smith's case was filed in this court by Thomas and Kevin Peters, who are brothers, and Gil Sapir.

Apparently, during Dotson's retrial, Bravo was asked who shot at him. Bravo identified Dotson and stated that "he would never forget the face" of the man who fired the shot. During discovery in Smith's case here, the City of Chicago produced an audio tape that included police radio traffic concerning the Smith shooting. Smith contends that the tape includes a reference to a police call of "shots fired" at a tire shop on Marquette Road approximately thirty minutes after the time when Smith was shot. According to Smith, Bravo says over the radio, "that might be the guy who fired at me here on Saginaw." Bravo's comment is significant, Smith contends, because by that time, Bravo had Dotson in custody. This, along with other alleged discrepancies, says Smith, amounts to a cover-up for Bravo's shooting of Smith. Bravo denies that the voice on the tape is his. Smith is seeking additional discovery to establish the identity of the speaker.

Once again, in a normal case, all of this would be presented to a jury to resolve the competing contentions. This is not a normal case. Upon listening to the tape and realizing its implication, Kevin Peters alerted Dotson's attorney, Gleicher, who promptly filed a motion for a new trial based on the fact that the prosecutors had withheld the tape from the defense in Dotson's trial. Dotson, apparently concluding that Peters was a more aggressive advocate than Gleicher, asked Peters to substitute for Gleicher in his state post-conviction proceeding. Peters agreed and now represents Smith and Dotson.

## II. Analysis

The defendants in the Smith case are now crying foul. They object to Peters' dual representation of Smith in her civil case and Dotson in his criminal case. The defendants have filed the instant motion to disqualify Peters in this case and to stay all discovery pending a decision by the state court on Dotson's motion for new trial.

A. Disqualification

Disqualification is "a drastic measure which courts should hesitate to impose except when absolutely necessary." Alex Munoz General Contractor, Inc. v. MC3D, Inc., No. 98 C 4489, 1998 WL 831806, at *2 (Nov. 25, 1998 N.D. Ill.) (quoting Owen v. Wangerin, 985 F.2d 312, 317 (7th Cir. 1993)). The moving party bears a "heavy burden" of establishing that disqualification is warranted. Id.

The Northern District of Illinois Rule of Professional Conduct LR83.51.7 prohibits a lawyer from concurrently representing a client whose interests are "directly adverse" to another client or whose interests would be "materially limited" by the lawyer's responsibilities to another client. LR83.51.7(a),(b) (respectively). If, however, (1) the lawyer "reasonably believes" the representation will not be adversely affected and (2) each client consents after disclosure, the lawyer may proceed with representation. LR83.51.7. The Committee Comment to the rule further states:

> As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without the client's consent. Thus [under section 83.51.7(a)], a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, such as competing economic enterprises does not require consent of the respective clients.

-4-

> [Pursuant to section 83.51.7(b),] [a] possible conflict does not itself preclude representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

In the instant case, Defendants' general argument appears to be that where a plaintiff's civil case and a defendant's criminal case rely on the same operative facts, the same lawyer cannot represent the two respective individuals, at least while both cases are still pending. The court finds no merit to this general contention. The defendants' specific claim is that there is a conflict between Smith's and Dotson's versions of events and that Peters cannot represent clients whose stories are at odds. In light of this purported conflict, defendants argue, Peters would be forced to cross-examine Smith as a hostile witness in Dotson's case and vice versa.

When the facts are viewed in the light most favorable to the defendants' motion, however, it is doubtful that there is an actual material conflict between Smith's and Dotson's respective prior testimonies. Smith stated that at some point on the night of the shooting, Dotson was firing a gun in the backyard, but that she was alone at the time that Bravo shot her. Dotson says that he never fired a gun that night, that he never pointed a gun at Bravo, and that he was not in the backyard when Smith was shot. Smith and Dotson offer consistent testimonies on this critical point: that Dotson was not present and certainly was not shooting a gun when Bravo encountered and shot at Smith.

The court finds that Smith and Dotson do not have "directly adverse" interests, and that Peters' representation of each of these two clients will not be "materially limited" by his representation of the other. Both Smith and Dotson have the same theory– cover-up. The

defendants in the Smith case will undoubtedly argue that Smith's constitutional rights were not violated because, at best, Smith was the victim of an accidental shooting. Bravo was justifiably returning Dotson's fire, defendants will maintain, when he accidentally struck Smith. Smith's case will succeed or fail based upon her ability to show that Bravo's version is untrue. She will presumably counter that Dotson was not at the shooting and did not fire a weapon in Bravo's presence. That is exactly Dotson's defense in his criminal case.

Because Smith's and Dotson's interests are very much aligned, this court is not convinced that the representation of both clients by Peters is violative of the ethical standard set forth in rule 83.51.7.[2] In other words, it cannot be said that Smith and Dotson should not have agreed to Peters' representation. See Comments to Rule 83.51.7 ("A client may consent to representation notwithstanding a conflict. However, . . . when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.") It appears that Smith and Dotson have been informed of a potential conflict and have waived any objections thereto. See Philips Medical Sys. Int'l B.V. v. Bruetman, 8 F.3d 600, 606 (7th Cir. 1993) (stating that Rule 83.51.7 may be waived by clients).

---

[2] Even if a substantial conflict of interest was evident, it is unclear whether the conflict would warrant disqualification at this stage. The issue before the state post-conviction court is whether the defendant' failure to produce the audio tape in the course of Dotson's criminal trial warrants a new trial. If, and when, Dotson is retried, the question of whether the testimony of Smith and Dotson will be inconsistent (and whether any inconsistency is relevant) can be addressed.

-6-

This court will not disturb the plaintiffs' choice of counsel without a more compelling reason.[3] See Alex Munoz, 1998 WL 831806, at *4 (noting the "dangers of depriving litigants of their chosen counsel").

B. Discovery

Defendants' other ground for disqualification (and for a stay) focuses on the negative ramifications (at least from defendants' perspective) of Peters' access to civil discovery. The defendants argue that Peters is using discovery in the civil case to obtain information for use in Dotson's criminal case.

Civil discovery is expansive in scope, especially in comparison to the restrictive nature of criminal discovery. Compare, e.g., Fed. R. Civ. P. 26(b)(1) (authorizing discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action") with Fed. R. Crim. P. 15(a) (limiting the deposition process). Courts have expressed concerns about discovery abuses stemming from the contrasting rules. See, e.g., Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1203 (Fed. Cir. 1987) (observing that the "broad scope of civil discovery may present to both the prosecution, and at times the criminal defendant, an irresponsible temptation to use that discovery to one's advantage in the criminal case"); Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir. 1962) (concluding that a "litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to

---

[3] In their briefs, the defendants cite to a line of cases involving disqualification for conflicts of interest. The cited cases, however, arise under the Sixth Amendment. In a civil case, the same stringent standards do not apply because there is no applicable guarantee of effective counsel.

-7-

avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal suit"); In the Matter of Film Recovery Sys., Inc., 804 F.2d 386, 389 (7th Cir. 1986) (stating that a "collateral litigation should not be permitted to exploit another's discovery in the sense of instituting the collateral litigation simply as a device to obtain access to the sealed information"). Consequently, some jurisdictions have granted district courts discretion to stay civil proceedings and postpone civil discovery in "the interests of justice" where parallel criminal actions were pending. Afro-Lecon, 820 F.2d at 1202. See Campbell, 307 F.2d at 487.

Afro-Lecon and Campbell involved the same parties in parallel proceedings. Namely, the criminal defendant was also a party to the civil case. In contrast, the instant case presents two distinct parties in the purportedly "parallel" actions. As discussed above, Smith's and Dotson's interests converge to a large extent, but that does not mean that Smith's case must be limited as a result of the proceedings against Dotson. More importantly, the court is not persuaded, in light of the two degrees of separation between Smith's and Dotson's cases, that the civil discovery process is being used inappropriately to supplement Dotson's criminal case.

Information derived from Smith's case has proved to be potentially useful to Dotson. But the court has observed no evidence of bad faith here. Peters commenced Smith's representation when Dotson was still represented by Gleicher. Thus, Peters could not have instituted the present case with improper intentions; nor do the defendants allege that Smith's case is a ruse to help Dotson.

The problem here is that Peters' belated undertaking to represent Dotson provides an opportunity for abuse. It may have been prudent for Peters to decline the Dotson case. The law,

however, does not require prudence under these circumstances. If defendants are worried that Peters might heretofore attempt to transform civil discovery into a treasure hunt for Dotson's criminal case, they may seek a protective order barring any improper discovery requests. The court will not permit Peters to dig where Smith has no interest. However, Smith is entitled to all discovery relevant to her theory. The fact that the same discovery is relevant to Dotson's attempt to obtain a new trial does not warrant staying discovery in Smith's case. Again, if Peters strays and attempts to obtain discovery in Smith's case that is not relevant to her theory, then the court may curtail his efforts. To circumscribe Smith's rights to discovery in a more sweeping manner, however, would penalize her without justification. If the defendants continue to have objections, they will get a second shot -- they can always urge the state court to preclude from Dotson's criminal case evidence improperly gathered in the civil case. The defendants' concerns of discovery abuses do not warrant Peters' disqualification or a stay of discovery.

C. Younger Abstention

Finally, the defendants seek to stay the whole of the instant civil proceedings pending resolution of Dotson's criminal matter before the state court.

As a general principle, federal courts have a "virtually unflagging obligation" to assume jurisdiction. Colorado River Water Conservation Dist., v. United States, 424 U.S. 800, 821, 96 S. Ct. 1236, 1248, 47 L. Ed. 2d 483 (1979). However, where considerations of comity have been compelling, the courts have abstained from interfering with ongoing state proceedings. In Younger v. Harris, 401 U.S. 37, 53, 91 S. Ct. 746, 754, 27 L. Ed. 2d 669 (1971), a plaintiff brought a § 1983 action in federal court challenging the constitutionality of a state criminal

-9-

statute under which he was being charged in a pending proceeding. The plaintiff sought equitable relief enjoining the state proceeding. Observing that the plaintiff had a full and fair opportunity to litigate the constitutional claim before the state court, the Supreme Court held that the federal courts should abstain from granting relief in a pending state court enforcement action. 401 U.S. at 53, 91 S. Ct. at 754. See Nelson v. Murphy, 44 F.3d 497, 501 (7th Cir. 1995) (concluding that the central principle of Younger is "that a party to a state proceeding affecting important governmental interests must resolve the dispute in the state's preferred tribunal.").

The Younger doctrine has been expanded beyond its original scope. See, e.g., Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975) (applying Younger to state civil actions); Samuels v. Mackell, 401 U.S. 66, 91 S. Ct. 764, 27 L. Ed. 2d 688 (1971) (extending Younger to cases in which declaratory judgments are sought). Of particular relevance to the instant case is Simpson v. Rowan, 73 F.3d 134 (7th Cir. 1995), in which the Seventh Circuit extended Younger to an action for damages founded on alleged misconduct underlying a state criminal conviction on appeal. 73 F.3d at 138. The federal plaintiff's § 1983 claim "raises constitutional issues that are potentially subject to adjudication in his appeal to the state supreme court," the Seventh Circuit reasoned, and the issuance of a "federal judgment might undermine the [state] supreme court's consideration of [the federal plaintiff's] constitutional defenses to his criminal conviction." Id. (adding that the "potential for federal-state friction is obvious" where the federal plaintiff's claims for false arrest and unconditional search were brought during an ongoing state appeal of his conviction). Instead of total abstention which would result in dismissal of the damage claim, however, the Seventh Circuit held that a stay of the federal case

was warranted until the resolution of the state proceedings. Id. at 138-39 (observing that monetary relief would be unavailable from the state court proceedings).

Were this the normal case, <u>Simpson</u> would be applicable and a stay would be granted. Yet resolution of the instant case is not so simple because the court is presented with an added twist: the plaintiff in this federal suit is not the same individual whose criminal appeal is pending before the state court. Previously, this court discussed the convergence of Smith's and Dotson's interests. But that is not to say that this court's adjudication of Smith's case will preclude or undermine the state court's reconsideration of Dotson's conviction. Whether or not Dotson fired at Bravo is an ancillary issue in the present case. The issue to be decided by this court in Smith's § 1983 case-- that is, whether <u>Smith's</u> Fourth Amendment Rights were violated by the defendants-- is too far removed from the issue presented to the state appellate court in Dotson's criminal appeal. Therefore, this court will not be subjecting state interests to federal interference by going forward with this case.

## Conclusion

For the foregoing reasons, the defendants' Motion to Disqualify Plaintiff's Counsel and Stay Civil Proceedings Pending Outcome of Related Criminal Matter is denied.

Enter:

*David H. Coar*

David H. Coar

United States District Judge

Dated:   **JUL 2 7 2000**